The case of the day is United States v. Miller Mr. Bruce, may I please the court? My name is William Bruce. I'm an appellate counsel for defendant appellant Earl Miller. Our position in this case is that the $4.5 million loss amount imposed by the district court was not a reasonable estimate. The court should have started with the approximately $3.7 million invested by the 45 investors during the scheme period. You mean the indictment period? During the indictment period, yes. It's from July 29th through August, July 29th, 2014 through August 2015. The government found that there were 69 investors during that time period, 45 of those investors they tied to the misspending by a defendant, but it didn't go further and perform the type of individualized inquiry and particularly some degree of application of the matching principle of accounting that was applied during the trial was not applied to evaluate whether or not the entire invested amount was actually part of the misspending by Mr. Miller during that scheme time period. And as the two primary cases we rely on, the defendant relies on is Chu Tu and Schaefer. Both of those cases discuss the need for individualized inquiries for the loss amount to distinguish between lawful and unlawful activity during the scheme period. I think because the government did not apply the appropriate methodology in determining the loss amount. Do you agree the loss amount can apply to the entire scheme? Yes. The whole scheme is relevant conduct? The whole scheme is relevant conduct. One issue is on day one of the scheme when he took over control, there were substantial payments to himself and to the prior owner, Mr. Gingrich. And so whether or not that is relevant to the loss amount because the investments that were being made were presumably made before the scheme started, before he had control of the company. And so I believe that the government's restitution chart for the 45 investors, looking at it, it excludes those type of investments that were made prior to the start of the scheme on July 29, 2014. I understood the district judge to be in essence not very convinced and at least somewhat impatient with the government efforts at individualized loss calculation. And so he approached loss amount in essence treating this as an embezzlement case, right? He talked about pilfering. And I got to say, that seems reasonable to me, at least within reasonable bounds for an estimate here. What's wrong with that? Well, it includes investments that were made prior to the start of the scheme. No, they're extracting money that they're not authorized to extract from the business, right? That's the theory. And it's happening during the period of the indictment. Yes, sir. It's happening during the period of the extraction part, but not the initial part of the indictment. So what? Well, it seems inconsistent to be able to go prior to when the scheme started and use investments going back in time. If I'm extracting money contrary to the terms of the private placement memoranda during the relevant indictment period, and all is part of the relevant scheme that started before, I think. I guess I'm having trouble seeing what's unreasonable about that. Well, when the scheme started was July 29. And so if you go before the scheme period, it's the unlawful conduct that he was charged and convicted of as part of the scheme would not start until July 29. And so investments that were made... Did the district court impose that boundary in its findings on relevant conduct? No, I don't believe so. But the restitution amount that tied the opinion of the district judge said that the 69 investors during the scheme period was inadequate because not all their investments were misspent. Well, restitution loss amounts, as you know well, are different standards, right? Yes. Okay, so that doesn't get us very far. Even though they are different standards, I would propose that the same causation principle and tying of the misspending to the investment during the scheme period is required for calculating the loss amount. Was it necessary to trace the embezzled money back to individual investors? Yes, some degree of tracing that was used for the convictions would also be needed as part of a more individualized inquiry to trace... How could you trace the loss to individual investors when the direct loss was to the business itself? That was cash. I think that the restitution should be to the business, and the investors would benefit because the business would have more money. But that's not something you've appealed, and I don't think you could appeal it. So what's left? Well, I might be misunderstanding the question. I apologize if I am. But the thing that made this case unique was there was multiple causes of the loss. On the one hand, there was a bankruptcy cause, and the fraud was not the cause of the entire loss. And so, being able to distill... Yes, there were both fraud problems and business problems. That's why the district judge rejected the $30 million as a loss amount. Yes. And just focused on what the defendant extracted from the business. He extracted both the entire amount, but also the investment amount of the 69 investors during the scheme period. And he used the $4.5 million as an estimate because it was the entire amount of the misspending. But the court also said that what the government should do is identify these individuals and do a causal chain, which they ended up doing later with the restitution chart. And so, that should have been a starting point of those 45 individual investors who were tied to misspending. The 45 investors during the scheme period tied to misspending was a starting point and used their $3.7 million that were invested to determine how much of that amount was misspent by Mr. Miller. Because there was also, at the end of the indictment period, there was misspending to Global Impact and Kozen O'Connor. And that came up around July of 2015. And he turned over control to those two entities. And the scheme period ended in August 2015, but those payments continued to be made through the end of 2015 into 2016. And so, the lack of an individualized inquiry prevents a determination of whether or not he was actually making those payments and he was in control of that amount. I thought the theory there was that he made the commitments that led to those payments. Yes. I mean, I don't recall on the record, but it seems like it makes sense that he, you know, would. I don't know how involved he was for those payments to be made by Kozen O'Connor and Global Impact. I guess part of the problem here, Mr. Bruce, is just how burdensome precision is and how precise does this need to be.  Particularly since most people engaged in fraudulent enterprises don't keep particularly helpful records of that. The last point I make is the case that is on point on that issue, I believe it was the Chu Tu case, saying that when you have a situation where you have concrete data such as this, that you need to have a more individualized inquiry and fact finding as opposed to doing a, you know, reasonable estimate like the district court has done. And I'll reserve the rest of my time for rebuttal. Thank you. Certainly, Counsel. Mr. Whalen. May it please the Court. Thank you, Your Honors. Nathaniel Whalen here on behalf of the United States of America. I'd like to address the Global Impact Kozen O'Connor question just before we get to the main part of this appeal for a second. The argument was never made down below that the defendant wasn't responsible for those payments. Had it been, the district court could have fleshed it out a little bit more. In the PSR paragraph 22, which the court adopted, it says that Miller made payments from five star accounts to dot, dot, dot, Global Impact and Kozen O'Connor. And to the extent that there's any concern about the factual basis for that record, Mr. Miller gave a under oath testimony during the bankruptcy proceedings, which were admitted as Exhibit 41 at trial, and he's asked about those payments. And at pages 226, 229, 230, 231, and 242 of that transcript, he acknowledges that he's the one that directed all these wire transfers to Global and Kozen. So, he's on the record under oath saying he's the one who made those payments. It wasn't just that he hired a company that then made the payments. So, there's no clear error in the district court's finding there. What's the theory for holding that, in essence, paying a law firm for services rendered to the business amounts to embezzlement?  Your Honor, I think what was going on here is that by the time we're in July of 2015, Mr. Miller sees the walls crumbling around him, and he's trying to avoid detection of the fraud. So, he brings on Global, which in turn brings on Kozen. And it's all an effort to keep the investors who are literally pounding at the door in the parking lot from detecting what's going on. That, admittedly, wasn't fleshed out as much. It wasn't raised, yeah. Okay. So, I believe that's the theory as to why that's part of the embezzlement. What the district court found here, though, was a reasonable estimate of the intended loss here, or of the loss in this case. There was $4.5 million that Ms. Teagarden, Agent Teagarden, testified were spent contrary to the terms of these private placement agreements. And that's what the district court took. Yes, there might have been some money that was initially given to Five Star prior to Mr. Miller taking over as the sole owner. But when he takes over in June or July of 2014, he now has access to all that money. He takes that $4.5 million, and he misspends it contrary to the terms that he had told the investors that he would use to spend it. That was a reasonable estimate of the loss in this case, and that's what the court did. There's no need—this court doesn't have case law that says you have to trace individual amounts back to individual investors. This court's case law of Shube and Schaefer does say that you have to point that the money that qualifies as loss is criminal in nature, and we agree with that. And the district court agreed with that. That's why it rejected our argument that 69 investors during the period, every cent they invested should qualify as loss. Because what Judge DiGiulio said is, yeah, they might have invested during that period, but you can't show that their investment was misspent contrary to the terms of these private placement agreements. What he did say, though, is each of these $4.5 million Miss Teagarden testified to, that was misspent. It was spent on entities, none of which were included in these private placement agreements. You know, this was a real estate company. Mr. Miller used it for personal gain. He used it to avoid the detection of the fraud, and that was criminal conduct that qualified as loss, unless this court has any questions on that or the restitution issue. I guess let me just ask the naive question. With the investments in these new green technologies and so on that were outside the scope of the placement memo, that's not necessarily going to Miller personally. So how is that different from just a breach of the contract? Yeah. So Mr. Miller was investing with some of his personal friends from Ohio. Those are the individuals who were involved in those green products. I think to the extent that he's gaining a personal benefit, it's a goodwill gesture towards his friends. And just to be clear, at a certain point, there were green products that were reflected in a private placement agreement. But what they said is, these are products, they're patents in existence, and we have a deal to market them to Bed Bath and Beyond and major retailers that probably aren't particularly useful. That was all smoke and mirrors or something. I'm sorry. That was smoke and mirrors. That was smoke and mirrors. There's testimony. There were no patents. There was never agreement for these infomercial individuals to ever sell these at Bed Bath and Beyond. You haven't raised, if I understand your brief correctly, Mr. Whalen, that the defendant waived or forfeited his challenge to the restitution amounts. Why not? Yeah. Your Honor, I think he preserved an argument about the legal analysis. I saw that. But that's not what he argued on appeal. I understood his argument on appeal to being that the district court was obligated to find that he had an intent to defraud before it qualified his restitution. I think he legitimately preserved that objection down below. I don't understand him to be making an argument as to the actual math involved or the individuals. And to the extent that I am misunderstanding, he certainly did stipulate as to the bottom line figure. That was clear from the district courts.  That is clear. Okay. All right. Thank you. So we ask that this court affirm. Thank you. Does Mr. Bruce have a few seconds? Forty-six. I rounded up to a minute. I'm trying my best. So a tube two case shows that in situations where there's concrete data like this, you need to have more individualized inquiry overall to tie the investments, the inflows to the outflows. With the reasonable estimate, a premise of the court in making that estimate was that it was a million dollars over the $3.5 million amount where you get to reduce the points. But if you start with the $3.7 million of those 45 investors that the district court signaled that should be the start of the analysis, then you're at $3.7 million. And it calls for a greater need for more individualized scrutiny over tying the investments to the actual misspending. And the last thing about the objection to the restitution, I understood that counsel in the lower court was preserving their objection that Mr. Miller was responsible for causing this entire amount of the loss for these investors, but he agreed with the restitution calculation if that was the starting point. Thank you. Thank you very much. Mr. Bruce, we appreciate your willingness to accept the appointment in this case and your assistance to your client. The case is taken under advisement.